RENDERED: FEBRUARY 26, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0877-MR

DENNIS HUTCHINSON                                                    APPELLANT


                    APPEAL FROM FLOYD CIRCUIT COURT
v.          HONORABLE JOHNNY RAY HARRIS, JUDGE
                    ACTION NO. 18-CI-00153


THE ESTATE OF MILLARD CALEB
SKEENS BY AND THROUGH ITS
ADMINISTRATOR, STANLEY
SKEENS                                                                APPELLEE


AND                         NO. 2019-CA-0878-MR

SGT. JAMIE FIELDS                                                    APPELLANT


                    APPEAL FROM FLOYD CIRCUIT COURT
v.          HONORABLE JOHNNY RAY HARRIS, JUDGE
                    ACTION NO. 18-CI-00153


THE ESTATE OF MILLARD CALEB
SKEENS BY AND THROUGH ITS

ADMINISTRATOR, STANLEY
SKEENS                                                                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, KRAMER, AND MAZE, JUDGES.

CALDWELL, JUDGE:  Dennis Hutchinson ("Hutchinson") and Sgt. Jamie Fields

("Fields") appeal from the Floyd Circuit Court's denial of their respective motions

for summary judgment.  They claim error in the trial court's not finding them

entitled to qualified official immunity for their actions in a high-speed pursuit of

Millard Caleb Skeens, who died from injuries in a single-vehicle motorcycle

accident shortly after the pursuit.  We affirm.

*Standards Governing Our Review*

Usually, an order denying summary judgment is not immediately

appealable.  *Mattingly v. Mitchell*, 425 S.W.3d 85, 91 (Ky. App. 2013).  But there

is an exception to this general rule—an order denying summary judgment based on

a determination that a defendant is not entitled to qualified official immunity is

immediately appealable.  *Id.* at 89.

Although the trial court did not specifically state in its order why it

denied summary judgment to both defendants, the defendants argued *inter alia* in

their summary judgment motions that they were entitled to qualified official

immunity.  We consider only whether the trial court erred in not concluding the

-2-

defendants were entitled to qualified official immunity and do not address any other matters raised in the summary judgment motions. *See id.* at 86 (narrowing the review of denial of summary judgment to consideration of qualified official immunity issues alone: "Because the remaining portions of the circuit court's order are not subject to immediate appeal, we do not address those issues.").

We review *de novo* the trial court's determination that Hutchinson and Fields were not entitled to qualified official immunity. *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citation omitted) ("once the material facts are resolved, whether a particular defendant is protected by official immunity is a question of law, which we review *de novo*."). *See also Patton v. Bickford*, 529 S.W.3d 717, 723 (Ky. 2016) (internal quotation marks and citation omitted) ("A motion for summary judgment presents only questions of law and a determination of whether a disputed material issue of fact exists. Our review is de novo, and we afford no deference to the trial court's decision.").

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence in the record included the depositions of Hutchinson and Fields, in which they discussed their recollections and a transcript of the dispatch recording about the pursuit. Hutchinson and Fields were also asked about their familiarity and compliance with Kentucky State Police (KSP) policies or directives about pursuits. The dispatch recording transcript and KSP pursuit policy in

General Order OM-B-15 were attached as exhibits to their depositions. The Estate of Millard Caleb Skeens submitted the affidavit of an experienced former KSP official, who opined that Hutchinson and Fields failed to comply with KSP directives in conducting the pursuit of Millard Caleb Skeens.

*The Pursuit as Described in Dispatch Recording*
*and Appellants' Depositions*

During the evening of July 31, 2017, Dennis Hutchinson was on patrol for Kentucky Vehicle Enforcement, a division of the Kentucky State Police. While on patrol, he observed two motorcycles traveling at high speeds. According to Hutchinson's deposition, radar showed one motorcycle to be traveling at 92 miles per hour and the other at 102 miles per hour. Hutchinson tried to pull over both motorcycle drivers. The driver of the somewhat slower motorcycle pulled over, but the driver of the faster motorcycle did not. Hutchinson followed the faster motorcycle, rather than stopping to talk with the driver who had pulled over.

Dispatch and Hutchinson's supervisor (Sgt. Jamie Fields) became aware of the pursuit via radio communications from Hutchinson. Hutchinson provided dispatch with information such as the southbound direction of travel and there being no traffic in that direction except for him and the two motorcycles he observed traveling at least 90 miles per hour. When the dispatcher asked him about the reason for trying to stop someone other than the rate of speed,

Hutchinson replied, "Got him at 101, he was passing cars in the median at Banner, I passed the other motorcycle he pulled off there . . . ."

The dispatch recording recounted Hutchinson continuing to advise dispatch about where he was traveling, noting passing landmarks such as a memorial garden and a car dealership, and describing his observations of the motorcycle. Fields informed Hutchinson he was on the way on the dispatch recording. The dispatcher asked about Hutchinson's speed, and Hutchinson replied 90 miles per hour. And the dispatcher inquired whether Hutchinson still had visibility. Hutchinson effectively affirmed, stating he was about three car lengths behind the motorcycle.

After having previously twice noted a lack of traffic on the southbound side, Hutchinson later noted he was "coming into a little traffic" as he approached a certain area and stated he was "going to back off a little bit." He then indicated that the motorcycle driver was turning on a road called 979 on the dispatch recording. According to his deposition testimony, Hutchinson turned off his emergency lights after turning on 979, but he continued to follow the motorcycle at a slower speed for awhile.

On the dispatch recording, Fields advised Hutchinson: "if you come up on any traffic on 979 or if it gets to excessive speed just go ahead and discontinue it." After Fields and Hutchinson discussed their respective

-5-

whereabouts on the dispatch recording, Hutchinson told dispatch he was "coming in the curve here at 979. I had lost sight of him when I came in the curve there's a faring [sic] laying in the road im [sic] going to see if I can turn around see if he might have wrecked."

Unfortunately, the motorcycle driver had wrecked, and he died from his injuries sometime shortly thereafter. He was identified as Millard Caleb Skeens, and his estate later filed suit against Hutchinson and Fields. We will refer to Skeens' estate as simply "Skeens" hereinafter.

Fields admitted in his deposition testimony that the pursuit should have been terminated under KSP policy once Skeens turned onto 979 based upon 979's posted speed limit of 45 miles per hour, which Fields was unaware of the night of the pursuit. Fields admitted policy would dictate telling Hutchinson to terminate the pursuit immediately, not just telling him to terminate if he encountered more traffic or if the speed became excessive.

Based on the dispatch recording transcript, Hutchinson never said he was "terminating" the pursuit although he indicated he would "back off a little bit." But Hutchinson testified via deposition to advising Fields he was terminating the pursuit when Fields called Hutchinson on his cell phone. Fields claimed to have tried to tell Hutchinson to stop the pursuit on the cell phone call in his deposition, but that Hutchinson said he had already terminated the pursuit but was still

"attempting to locate" Skeens. Fields further admitted that he should not have contacted Hutchinson via cell phone, but Fields indicated he had lost radio contact with Hutchinson when he dropped the microphone. However, there was no recording of any cell phone call between Hutchinson and Fields, nor did they come forward with any record showing the cell phone call took place.

*Trial Court's Ruling on Appellants' Summary Judgment Motions*

Hutchinson and Fields each filed a motion for summary judgment. Both asserted qualified official immunity as one basis for summary judgment. But they also asserted other grounds, such as failure to establish various elements of a negligence cause of action including duty, breach, and causation.

In its succinct order denying summary judgment for both defendants, the trial court did not further explain the basis for its ruling but explicitly stated that Fields could refile his motion for summary judgment once he came forward with cell phone records about the "alleged cell phone call" to Hutchinson. Unfortunately, we cannot ascertain the trial court's reasoning as any transcripts or video recordings of hearings were not included in the record on appeal, and narrative statements were not prepared pursuant to Kentucky Rules of Civil Procedure (CR) 75.13.

## ANALYSIS

Kentucky precedent clearly holds that an appellant is responsible for "ensur[ing] that the record contains all of the materials necessary for an appellate court to rule upon all the issues raised" and "we are required to assume that any portion of the record not supplied to us supports the decision of the trial court." *Clark v. Commonwealth*, 223 S.W.3d 90, 102 (Ky. 2007) (citations omitted). *See also Brannock v. Brannock*, 598 S.W.3d 91, 95 (Ky. App. 2019). Therefore, we review the trial court's denial of summary judgment for qualified official immunity purposes under the somewhat limited record before us.

In considering the summary judgment motion, the trial court must construe the evidence in the light most favorable to the party opposing summary judgment (here, Skeens) and resolve all doubts in its favor. The trial court can properly grant summary judgment only where "it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Mattingly*, 425 S.W.3d at 89 (quoting *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991)).

As we review whether the trial court properly denied the summary judgment motion considering assertions of qualified official immunity, we heed the parameters of qualified immunity set forth in Kentucky precedent with its emphasis on the distinction between discretionary and ministerial acts:

Under the qualified immunity doctrine, public officers and employees are shielded from liability for the negligent performance of discretionary acts in good faith and within the scope of their authority. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). The distinction between a discretionary act and a ministerial act is pivotal to the immunity determination. A discretionary act involves the exercise of discretion and judgment or personal deliberation. *Id.* A ministerial act is one that is "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* The *Yanero* Court elaborated: "An act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." *Id.* Quoting *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky. 1959), the Court emphasized "[t]hat a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in nature." *Id.* Because few acts are purely discretionary or purely ministerial, the courts must look for the "*dominant* nature of the act." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010).

*Mattingly*, 425 S.W.3d at 89-90. Applying this precedent in light of KSP pursuit policies and our review of the evidence in the record, we conclude that the trial court properly determined that Appellants were not entitled to summary judgment on qualified official immunity grounds.

Relevant KSP directives about the initiation and termination of pursuits are set forth in General Order OM-B-15, which defines a vehicle pursuit as: "An active attempt by an officer in an authorized emergency vehicle to apprehend a fleeing suspect who is actively attempting to elude the police."

(General Order OM-B-15 is attached as Exhibit K to the appellee's brief and was also attached as an Exhibit 1 to Fields' deposition in the record.)

Regarding the initiation of a pursuit, the KSP policy states:

A. The decision to initiate pursuit/emergency response driving will be discretionary with each individual officer.  The officer <u>must</u> weigh the need for immediate apprehension against the risk created to all others by the pursuit.  The factors to be considered in initiating and continuing a pursuit or emergency response driving should include, but are not limited to the following:

1. Seriousness of the call or a violator's offense (i.e. if the offender is allowed to flee, he would present a danger to human life or cause serious physical injury.) A charge of wanton endangerment arising from a vehicular pursuit shall not be the singular reason for continuing a pursuit;

2. Identity of the offender, if known, and the likelihood of apprehension;

3. Factors such as pursuit/emergency response speed, weather, roadway conditions, time of day, location of the pursuit/emergency response, and the condition and capabilities of the pursuit and pursued vehicles; and

4. Amount of vehicular and pedestrian traffic.

(OM-B-15, pp. 3-4 of 9.)  Under this same policy, an officer's responsibilities during an ongoing pursuit include keeping his siren and emergency lights operational, informing the post of the pursuit and certain required information, and maintaining control and safe operation of the vehicle.  (OM-B-15, pp. 4-5.)

-10-

The policy further states:  "Pursuits shall be <u>terminated</u>" under certain listed conditions, including the pursuit entering "a commercial area, residential area, school zone, or other roadway where the posted speed limit is less than 55 MPH, unless the pursuit is conducted for a violent felony offense or supervisory approval has been granted[.]"  Other listed reasons mandating termination include an order to terminate the pursuit being issued by the supervisor monitoring the pursuit, the offender's general location becoming unknown, and an officer's reasonable belief that the dangers of continuing pursuit outweigh the need for immediate apprehension in light of factors like vehicle performance capabilities, road surfaces, and weather conditions.  (OM-B-15, p. 6.)

Hutchinson and Fields argue in their joint appellant's brief that they were entitled to summary judgment on the ground of qualified official immunity, asserting that Hutchinson's acts were discretionary, that the dominant nature of Fields' acts was discretionary, and that Hutchinson did not negligently perform the ministerial act of driving.  But Skeens argues the trial court properly denied summary judgment and that Appellants were not entitled to qualified official immunity.

Skeens contends that Hutchinson and Fields failed to comply with mandatory duties in the KSP pursuit policy, pointing to language requiring that officers "shall" weigh various factors when deciding whether to initiate pursuit and

that officers "shall" terminate pursuit under certain conditions including entering an area with a posted speed limit of less than 55 miles per hour. So, Skeens argues that their actions were ministerial, and they should not be accorded any type of immunity.

Hutchinson and Fields, on the other hand, point to language in the policy stating that initiation of a pursuit is "discretionary" to argue that their actions were discretionary, and they were therefore entitled to qualified official immunity. They also contend that Hutchinson complied with any duty to terminate the pursuit when turning onto 979, based on him slowing down and turning off his emergency lights, and that Hutchinson advised his supervisor (Fields) that he terminated the pursuit via a cell phone call. Skeens claims that the trial judge stated in a hearing that he was denying the summary judgment because "backing off" was not the same as "terminating" a pursuit. But no specific citation to a recording or transcript was provided.

Reviewing the record before us, mindful of the trial court's duty to construe the evidence in the light most favorable to Skeens and to resolve all doubts in Skeens' favor, we see no error in the trial court's denying summary judgment to Hutchinson and Fields under the facts and circumstances here. Even accepting that the decision to initiate a pursuit is discretionary as stated by the KSP pursuit policy, there appears to be a nondiscretionary duty to keep emergency

-12-

lights operational during a pursuit and a nondiscretionary duty to terminate a pursuit under certain circumstances. For example, the policy states that the pursuit "shall" be terminated when traveling in an area with a posted speed limit of less than 55 miles per hour. Fields admitted in his deposition that the pursuit should have been terminated immediately when turning onto 979 under the KSP policy and that he should have directly ordered Hutchinson to terminate the pursuit. He claimed to have tried to more clearly order Hutchinson to terminate the pursuit via a cell phone call in which Hutchinson said he had already stopped the pursuit but was still trying to locate the motorcyclist. But there were no recordings of this call, and Appellants did not come forward with a record that the call even occurred.

Failure to comply with a clear duty not involving the exercise of individual discretion is construed as a ministerial act under Kentucky law for which an individual is not entitled to qualified official immunity. *See Yanero*, 65 S.W.3d at 529 (holding that coaches' failure to enforce a known school rule requiring that student athletes wear batting helmets during baseball practices was a ministerial act and therefore coaches were not entitled to qualified official immunity).

The evidence of record did not clearly establish that Hutchinson terminated his pursuit when Skeens turned onto 979. Despite Hutchinson slowing down somewhat and turning off his emergency lights, his continuing to follow

Skeens could be considered continuing to pursue Skeens under the KSP definition of pursuit: "An active attempt by an officer in an authorized emergency vehicle to apprehend a fleeing suspect who is actively attempting to elude the police." This is further supported by a witness's deposition testimony about being passed by the motorcyclist on 979, quickly followed by being passed by Hutchinson's vehicle. Additionally, if Hutchinson did not terminate the pursuit after turning onto 979, his turning off his emergency lights would appear to violate the portion of the pursuit policy stating that emergency lights should remain operational during the pursuit.

In regard to Fields, he admitted in his deposition that he should have ordered the pursuit immediately terminated when Hutchinson advised he was turning onto 979. On the dispatch recording, Fields did not clearly advise Hutchinson to terminate the pursuit but simply advised him to discontinue if he came upon more traffic or if the speed became excessive—after Hutchinson had already reported traveling at 90 miles per hour on the dispatch radio. As for the unrecorded cell phone call mentioned in the deposition testimony of Hutchinson and Fields (which the trial court referred to as an "alleged phone call"), the trial court seemingly recognized that there may be a factual issue as to whether the call happened at all. Even accepting Hutchinson's and Fields' accounts, Hutchinson's description of continuing his attempts to locate the motorcyclist suggests the

-14-

pursuit was not completely terminated and that he did not effectively communicate termination of the pursuit to his supervisor.

While we recognize that at least under certain circumstances whether to initiate or continue a pursuit appears to be discretionary under the KSP policy, there also appear to be clearly defined duties to do specific things (like keeping emergency lights on during a pursuit and terminating on a road with a speed limit under 55 miles per hour) which are not matters for the officer's discretion. Thus, the dominant nature of many of Hutchinson's and Fields' actions was ministerial. Further, the record contains evidence showing they failed to comply with essentially ministerial duties to terminate the pursuit immediately under certain circumstances. Therefore, Hutchinson and Fields are not entitled to qualified official immunity based on the record before us, and the trial court did not err in denying them summary judgment on this ground.

Hutchinson and Fields cite authority which seemingly suggests that all decisions to begin or terminate a pursuit are discretionary functions. *See City of Brooksville v. Warner*, 533 S.W.3d 688, 694 (Ky. App. 2017) ("An officer has discretion to decide whether to begin, continue, or end the emergency pursuit, but not for the way he or she operates the police vehicle during the emergency pursuit."). But the decision to initiate or terminate the pursuit was not really the primary issue in *Warner*, wherein a law enforcement vehicle had collided with a

motorcyclist while engaged in a high-speed pursuit of another motorcyclist. Instead, the law enforcement officer was held not entitled to qualified official immunity for alleged negligent operation of his vehicle as the act of driving has long been considered ministerial. *Id.* at 694-95.

More on point, Hutchinson and Fields cite an unpublished case concluding therein that the law enforcement officers' conduct and termination of a pursuit were discretionary acts for which they had qualified official immunity. *See Plummer v. Lake*, No. 2012-CA-001559-MR, 2014 WL 1513294 (Ky. App. Apr. 18, 2014) (unpublished). We recognize that this unpublished case is not binding authority and do not rely on it for our holding, but we simply address it briefly in response to Hutchinson's and Fields' joint brief relying upon it.[1]

Given its very different facts with essentially no indication that the law enforcement officers failed to substantially comply with clear nondiscretionary duties regarding pursuits arising from their departmental policies or other applicable law, *see id.* at *7, *Plummer* does not support qualified official immunity for the officers under the facts here.

---

[1] We note that Hutchinson and Fields failed to fully comply with the requirements of Kentucky Rules of Civil Procedure (CR) 76.28(4)(c) regarding citation of unpublished opinions--for example, no copy of this unpublished opinion was attached to their brief. We admonish counsel to take greater care to comply with the requirements of CR 76.28 in appellate briefs in the future. With the exception of *Plummer*, we decline to address the numerous unpublished cases cited in their brief in violation of CR 76.28(4)(c).

Rather, in light of the affidavit of an experienced former KSP official that the officers clearly failed to comply with KSP policy, we hold that the instant case is more factually akin to *Mattingly*—in which another law enforcement officer observing the pursuit in progress declined to participate in the pursuit since he viewed it as a clear violation of departmental policies closely resembling the KSP policies at issue here. 425 S.W.3d at 87-88. We stated therein:

> Whatever discretion Mattingly may have had in initiating and continuing a pursuit, it was limited by the Louisville Metro Police Department's Standard Operating Procedures . . . [and] those procedures provide specific directives to its officers when initiating or engaging in a pursuit. The repeated use of the term "shall" establishes that compliance with its provisions involve "merely execution [or nonperformance] of a specific act arising from fixed and designated facts."

*Id.* at 90 (quoting *Yanero*, 65 S.W.3d at 522). Noting that the officer's failure to comply with these specific departmental directives was undisputed, we affirmed the trial court's denial of summary judgment based on its determination that the officer was not entitled to qualified official immunity. *Id.* at 90-91.

This case may not appear to be quite as clear-cut as *Mattingly*, in which the officer was subjected to discipline for violating department standards in conducting the pursuit. *Id*. at 87-88. But we hold that discretion to initiate or continue pursuits was similarly limited by specific agency directives, which established clear duties including a mandatory duty to terminate the pursuit under

certain circumstances. And, as in *Mattingly*, another law enforcement officer (here formerly with the same agency as Appellants) offered a clear opinion that the pursuit did not comply with specific, clear directives under the law enforcement agency's pursuit policy.

Skeens offered the affidavit of retired KSP Major Lynn Cross, who explained that the policy was intended to discourage and place clear restrictions on pursuits. Perhaps one could quibble with some of Cross's opinions (such as describing driving over 90 miles per hour on public roads as a minor traffic infraction or interpreting the policy to forbid pursuits through residential or commercial areas where the posted speed limit may not have been under 55 miles per hour). Nonetheless, this experienced officer's clearly stated opinion that the pursuit which occurred here should have never occurred or should have been quickly terminated under KSP policies clearly weighs in favor of affirming the trial court's conclusion that Appellants are not entitled to summary judgment on the grounds of qualified official immunity.

In addition to the KSP official's affidavit, the dispatch recording and deposition testimony of Hutchinson and Fields also support the trial court's conclusion that these officers are not entitled to qualified official immunity. The pursuing officer noted passing commercial establishments on the dispatch recording and traveling at speeds of about 90 miles per hour in a fruitless attempt

to catch a motorcyclist traveling at excessive speeds. Then he continued to follow the motorcyclist onto a curvier and less-traveled road with a posted speed limit of less than 55 miles per hour. His supervisor did not clearly advise him to terminate the pursuit on the dispatch recording, and no records were produced to substantiate an allegation that the officer notified his supervisor of terminating the pursuit by cell phone call. Furthermore, the supervisor admitted in his deposition testimony that it was a violation of policy to call the officer on his cell phone. And though the supervisor testified to thinking he was complying with departmental policies at the time, he admitted in retrospect that there were some things he could have done differently and specifically admitted that he should have ordered the pursuit immediately terminated when advised it was proceeding onto 979.

In short, the trial court did not err in denying summary judgment on the basis of qualified official immunity from our review of the evidence in the record. Our holding is specifically limited to the facts and circumstances of this particular case.

Any other arguments in the briefs which are not discussed herein are determined to be without relevance or merit. Again, we express no opinion on any other matter (including, but not limited to, causation of the decedent's accident or death), but we simply affirm the trial court's determination that Hutchinson and

Fields are not entitled to summary judgment on the basis of qualified official immunity from our review of the record before us.

## CONCLUSION

For the reasons stated herein, we affirm the judgment of the Floyd Circuit Court.

ALL CONCUR.

BRIEF FOR APPELLANTS:

Gregory Funfsinn
Cayla Combs
Lexington, Kentucky

Sean M. Whitt
Scott W. Andrews
Ashland, Kentucky

BRIEF FOR APPELLEE:

Ron Diddle
Pikeville, Kentucky